**Harry KOPLIN, Appellant,**

v.

**George KELRICK et al., Appellees.**

Court of Appeals of Kentucky.

May 18, 1962.

As Modified on Denial of Rehearing
Oct. 12, 1962.

Shumate & Shumate, Irvine, for appellant.

D. L. Pendleton, Jr., Stanton, Jess S. Hogg, Winchester, for appellees.

PALMORE, Judge.

In 1953 the appellant, Harry Koplin, assigned to the appellees, George Kelrick and other members of the Kelrick family, undivided working interests in a group of oil and gas leases in Lee County, Kentucky,

called the Cable Project. Under the terms of the assignments Koplin and one Edward Gimbel were designated as operators of the project with power to market the oil and gas produced, collect the proceeds, deduct the expenses of production and sale, and pay over to the assignees their pro rata shares of the balance.

This suit was brought by the Kelricks against Koplin in April of 1956. It demanded recovery of $11,207.33 as their share of the net proceeds unpaid as of January 31, 1956, and an accounting. Koplin denied the indebtedness and counterclaimed for $10,000 allegedly loaned to George Kelrick on September 1, 1955. The case was tried by deposition and resulted in a judgment for the Kelricks in the full amount sought. Koplin appeals. His contentions are (1) that the judgment was based on incompetent evidence improperly admitted and (2) that he and the Kelricks were members of a mining partnership and an action for an accounting could not be maintained prior to its dissolution. Following an elaboration of the facts of the case, we shall discuss these points in reverse order.

It appears that as between Koplin and Gimbel, Koplin was the outside man and Gimbel the bookkeeper. Gimbel, a member of a Chicago accounting firm, handled the money, and all went well until he died early in 1955. Up until that event the Kelricks received a total of $4,026.10 through regular payments representing tentative net income. The last checks issued by Gimbel were for the month of October, 1954, and were received in January of 1955. Thereafter, by his own admission, Koplin became the sole operator of the Cable Project, though he neither asked nor received authority from the Kelricks to act singly. Payments to the Kelricks ceased forthwith. Their repeated demands of Koplin for information were parried by the explanation that the records had been turned over to an accounting firm in Denver, which apparently was unable to straighten them out. Finally, at the insistence of the Kelricks, new division orders were executed pursuant to which further payments for oil purchased from the project were made directly by the purchaser, Ashland Oil and Refining Company, to the Kelricks, subject to a deduction of .6 of 1% in favor of Koplin for "lifting costs." The exact date of this re-arrangement is not shown, but it was in late 1955 or early 1956 and, presumably, took effect as of February 1, 1956. From that time until all of the parties sold their interests to the Climax Molybdenum Company in December of 1956 (during the pendency of this action) the Kelricks received from Ashland, as their share of the oil produced and sold by the Cable Project, some $20,000.

During the interim between the cessation of payments by Gimbel and the commencement of payments by Ashland, Koplin received the money for the oil, though he did so under the name of Lee Oil Company. On July 5, 1955, he wrote George Kelrick, "If you want some money on account, let me know and I will advance it to you." On September 1, 1955, he gave Kelrick a check for $10,000, which he says was a loan and Mr. and Mrs. Kelrick say was paid on account toward what he would owe them when the books were eventually balanced.

At this point it is necessary that we explain the Lee Oil Company. According to Koplin, he did not serve as operator of the Cable Project strictly in his own right, but in behalf of Lee Oil Company, a partnership composed of himself, another member of his family, Gimbel, and a Chicago lawyer named Dashow, all of whom owned fractional shares of the working interest. This firm, through Koplin, managed the business, including financial receipts and disbursements. The Kelricks and some 15 other co-tenants of the working interest were referred to as "outside" interest holders. The $10,000 check to George Kelrick was drawn on Koplin's personal account rather than the funds of Lee Oil Company. Therefore, says Koplin, it could not have been on account of what Lee Oil Company owed and, even so, it should be repaid him anyway because an "audit"

of the partnership books (hereinafter mentioned more fully) showed the Kelricks to be indebted to it instead of its being indebted to them. Reserving this latter point for the moment, we think the answer to this line of argument is that the Kelricks had no agreement with the Lee Oil Company. They authorized no one but Koplin and Gimbel to operate the project in their behalf, and whatever arrangement these two may have had with other associates was their own affair. To the Kelricks the very existence of Lee Oil Company was irrelevant except as a nom de plume under which Koplin conducted his oil ventures. Under the contract the Kelricks were entitled to look solely to Koplin and Gimbel, and after the latter's death, to Koplin alone.

It is immaterial, of course, that the defendant was named in the complaint as "Harry Koplin, d/b/a Lee Oil Company." The references in the caption and in the body of the complaint to Koplin's doing business as Lee Oil Company are merely descriptive. Koplin is the only defendant, and the complaint does not purport either to be against a partnership or, indeed, to involve a partnership matter. It is simply a suit against an agent to require him to divulge and disgorge what he owes his principals.

■ This view of the case brings us full face to Koplin's contention that the suit is by one partner against another for a premature accounting, and what we have said thus far foretells the answer. Section 8 of the contract provides as follows:

> "8. The powers granted to the Operators by Paragraph 4 shall be construed so that the said Operators in acting as agent for the Assignee, shall be deemed to act for him separately, · although the Operators may represent other owners of interests in the above property."

We need not consider whether the various "outside" and "inside" (Lee Oil Company) parties were, by virtue of their undivided interests, mining partners (see, however, Appleby v. Buck, Ky.1962, 351 S.W.2d 494, 497–8), nor whether an action for an accounting brought by one partner against the other while continuing to do business will lie. As we see it, whatever else may have been the technical or legal relationship of the various interest holders, Koplin occupied also the position of agent for these particular co-tenants, and there is no sound reason why they should have been required to await the cessation of their community of interest through transfer of his or their fractional mineral shares to a third party or parties before bringing suit for an accounting.

■ Actually, the trial court did not require an accounting of Koplin and he did not render one. The Kelricks had about the same success in eliciting information from him through court as they had experienced in the months following Gimbel's death. The only new information that turned up was two sets of financial statements (loosely referred to during the proceedings as "audits") prepared from the accounting records of the Lee Oil Company, without verification by audit, by a firm of accountants in Wichita, Kansas, hired by Koplin. One of these sets of statements purported to reflect the condition of the Cable Project and the amounts due to · or from the "outside" owners as of November 30, 1956. They were introduced in evidence by Koplin's counsel without objection during the course of his cross-examination of George Kelrick, who conceded that he had theretofore been furnished a copy of the statements. The accountants who prepared the reports did not appear, and the only witness who attempted to breathe probative life into them was Koplin's Chicago lawyer, Dashow, who turned witness and testified that he had personally verified the statements by checking them against the books and records of the Lee Oil Company at its office in Lee County, Kentucky. There was no evidence as to what kind of original records and accounts were kept by the Lee Oil Company and whether they were accurate

and sufficient to serve as a reliable basis for the preparation of summary statements. On their face and without explanation by a qualified expert, these statements show a net balance of $5,541.03 owed by the Kelricks to the Lee Oil Company as of November 30, 1956. However, Kelrick did not admit, and Dashow was not qualified to say, that they were correct, and even though they were technically lodged in the record as "evidence," in the absence of competent foundation testimony connecting them with the original books and records and showing that the latter were available for inspection and comparison (cf. Municipal Paving Company v. Farmer, Ky.1953, 255 S.W.2d 618, 620) they had no probative force whatever. The accuracy of a subsidiary statement cannot be assumed without any evidence of the adequacy and authenticity of the original records from which it was prepared.

■ Since the apocryphal "audits" had no evidentiary value, Koplin's contention that he is entitled to recover the $10,000 paid the Kelricks because nothing was owed to them is completely unsupported. Mrs. George Kelrick testified that when Koplin gave the check to her husband on account he promised to "send you the balance as soon as the books are in balance." If so, this was an admission by Koplin that at least $10,000 was owed. As between the contradictory testimony of the respective parties there was ample evidence to sustain a factual finding either way. Hence the chancellor's judgment favorable to the Kelricks on this particular phase of the dispute is final and conclusive.

We come now to the question of whether Koplin was prejudiced by the improper admission of incompetent evidence. We have concluded that he was.

■ The claim of the Kelricks was that up until the time they began to receive payments from Ashland their proper share of the net proceeds of the Cable Project was $25,233.43, of which $4,026.10 had been paid by Gimbel prior to his death and $10,000 by Koplin on September 1, 1955, leaving an unpaid balance of $11,207.33. Although their complaint demanded an accounting in addition to the recovery of this sum, there was no order of reference and the case was practiced in the same fashion as any other suit on a liquidated debt. As we have said, Koplin never did render an accounting. Thus it was incumbent upon the Kelricks to adduce the evidence necessary to establish the amount of their stated claim.

George Kelrick testified, over objection, that he had arrived at the sum of $25,233.43 as the plaintiffs' share of the proceeds of the Cable Project oil production for the period in question by computation based on "the figures on the oil runs and for the total monies received by the Lee Oil Company and our checking with Ashland Oil and Refining Company." He said that he had obtained the "oil runs" at the office of the Lee Oil Company and, combining this information with data received from Ashland, was able to ascertain the Kelricks' percentage of the income at $25,233.43. The only other evidence bearing upon the amount of the indebtedness was the testimony heretofore mentioned with respect to the $10,000 check given by Koplin to Kelrick on September 1, 1955, and Koplin's alleged admission at the time that there would be a further balance due the Kelricks when the books were put in order. To the extent, therefore, that the judgment fixed an amount of recovery—to wit, $11,207.33—beyond the $14,026.10 theretofore received by the plaintiffs, it was founded on the testimony of George Kelrick as derived from Ashland and from the "oil runs" observed by him in the Lee Oil Company office.

■ It would have been proper to prove by an appropriate officer or employee of Ashland, from its books and records, the quantity of oil that company had purchased from the Cable Project during the period in question and how much it had paid Koplin or the Lee Oil Company for it. But for Kelrick to give it second-hand was an obvious violation of the hearsay rule. See Citizens Telephone Co. v. Anderson, Ky.

1956, 291 S.W.2d 527, 529; Illinois Cent. R. Co. v. Holt, 1906, 29 K.L.R. 135, 92 S.W. 540, 541.

■ It would also have been proper to prove the same facts from the books and records of the Lee Oil Company, as it seems to us that the respective records of the buyer and seller would qualify equally as the best evidence. A witness may not, however, give in evidence information taken from account books that are absent but still in existence and available. Harlan Coal & Coke Co. v. Davidson, 1924, 203 Ky. 580, 262 S.W. 936, 937. Moreover, the mere reference to "oil runs" as the documentary source was too indefinite to be probative. Cf. Citizens Telephone Co. v. Anderson, Ky.1956, 291 S.W.2d 527, 529. No business record of any kind can have meaning unless it be shown how it is made up and kept. What, exactly, is an "oil run"? Is it made up in dollars or barrels, or both? Is it made up by the well or by the lease? With the oil run figures at hand, what calculations would be required in order to arrive at the gross amount (to say nothing of expenses chargeable against it) due the Kelricks?

We can well appreciate the difficulty of establishing the proper amount of a claim based on the net income of a business venture when most if not all of the pertinent information is in the possession of a hostile and evasive defendant. After a reading of Koplin's deposition the temptation to affirm this judgment on general principles is strong. However, we are committed to the rule of law. Koplin admitted that the financial records of Lee Oil Company were in Chicago and were "readily accessible," and we see no reason why they could not have been reached for inspection and analysis by the simple device of a court order, had such an order been requested. Under the circumstances we find no reasonable basis for an exception to the best evidence rule.

Upon the retrial of this case the problem of the Kelricks in proving the amount of their claim will be simplified by Koplin's judicial admission, made during his previous testimony, that as a part of the negotiations culminating in the sale of the Cable Project to Climax Molybdenum Company he agreed to release the Kelricks of any pending expense charges. (That Koplin released the Kelricks was conceded on both sides. Whether as a part of the same transaction the Kelricks also released Koplin, as he claims, was necessarily decided in the negative by the chancellor's finding upholding the claim of the Kelricks.) This eliminates the necessity of proving any item but the gross proceeds (from the cessation of payments by Gimbel until recommencement by Ashland) multiplied by their pro rata shares, against which the $10,000 received from Koplin is to be credited.

We construe the judgment of the circuit court as denying the counterclaim for $10,000, and to that extent it is affirmed. To the extent that it awards recovery to the plaintiffs it is reversed and the cause remanded for a new trial in accordance with this opinion.