Wardle **BARNETT**, Appellant,

v.

E. F. **HAGANS**, Appellee.

Court of Appeals of Kentucky.

June 13, 1969.

As Modified on Denial of Rehearing
Oct. 24, 1969.

George C. Perry, III, Perry & Taylor, Paintsville, Francis Dale Burke, Burke & Justice, Pikeville, for appellant.

O. T. Hinton, Pikeville, for appellee.

STEINFELD, Judge.

Appellant Barnett and Alert Oil & Gas Company were co-owners of a gas well known as Romans Well # 2. A dispute arose as to whether Barnett agreed to convey to appellee, Hagans, a 10-percent working interest in that well in settlement of an undetermined amount Hagans claimed for overpayment in a joint venture involving a Knott County well and in consideration of Hagans' having obtained for Barnett an oil and gas lease of the property on which the well was located. Suit was instituted to force Barnett to convey a 10-percent working interest and for an accounting and payment of 10 percent of the past and future net proceeds of the well. No other claim was stated or demand made. The jury found in Hagans' favor, whereupon the court adjudged that he recover $6,941.01 interest and costs and that he

" * * * is the owner of a one-tenth (⅒th) working interest in said Roman's Well No. 2 * * *." After motions for a new trial and for judgment notwithstanding the verdict were overruled, Barnett appealed from the judgment. We reverse.

Barnett was a contractor engaged in drilling oil and gas wells. He owned the equipment necessary for doing that work. Hagans was employed by oil and gas production companies. In 1963 Barnett drilled a well in Knott County under a joint venture arrangement with Hagans and the Hurt brothers. Hagans was to pay 30 percent, Hurt brothers 30 percent, and Barnett 40 percent of the cost of drilling, with the profits being divided in that same ratio. The evidence indicated that Hagans had invested more in that project than his 30-percent share which created an indebtedness from Barnett to him. It also appears that sometime between 1963 and January 1965, Barnett became interested in obtaining a lease on the Romans property which was under lease to United Carbon Company. Hagans was an employee of United until it sold out to Ashland Oil & Refining Company, and then was employed by Ashland. Hagans asked Barnett "if he would be interested if the company released it, or if the company would assign him part of it to drill a well on, and he said he would * * *." Hagans wrote a letter to Ashland, and it dealt directly with Barnett after which Ashland assigned approximately one-half of its lease to Barnett.[1]

Hagans had told Barnett that Alert Oil and Gas Company, of which Hagans was a stockholder and later president, would be interested in acquiring 50 percent of " * * a lease that looked like worth drilling * * *." In September 1965, Barnett and wife conveyed to Alert 50 percent of their interest in the Romans lease.

Hagans testified that he had gotten word from Ashland Oil that it would assign the lease to Barnett, and he told him so. He contends that later, about July 1965, Barnett said that Hagans had put too much into the Knott County project and that to adjust claims and for his services in helping to get the Romans well he would give Hagans a 10-percent working interest in that well.

■ On the jury trial Barnett moved for a directed verdict on several grounds. One of them, on which he relies here for reversal, is that there was no consideration to support Hagans' claim. He argues that a " * * * past consideration is insufficient to support a promise." 12 Am.Jur. 586, Contracts, § 93. He cites Georgetown Construction Co. v. Moss & Donovan, 218 Ky. 32, 290 S.W. 1070 (1927), and 17 C.J.S. Contracts § 116, p. 837. There was ample evidence that the claim was not based entirely on a past consideration, for part of it was predicated upon the obligation claimed by Hagans of money due him from Barnett to settle the Knott County well venture.

The second defense now relied on was "that the promises and agreements alleged in the complaint pertaining to the sale or lease of an interest in real estate for longer than one year and such agreement, if any there was, could not be performed within one year from the making thereof, and there is no memorandum of said alleged agreement in writing signed by the defendant or by any other person by him thereunto lawfully authorized and the said alleged promises and agreements are unenforceable and therefore plaintiff's alleged cause of action is barred by the provisions of KRS 371.010." The Statute of Frauds is broken down into eight sections. The preamble and subsections (6) and (7) read:

"No action shall be brought to charge any person:

* * * * * *

"(6) Upon any contract for the sale of real estate, or any lease thereof for longer than one year;

1. The lease is not in the record.

"(7) Upon any agreement that is not to be performed within one year from the making thereof; * * *."

In his pleadings, Barnett did not indicate on which of the several subsections he based his defense. His contentions appear to be that the alleged agreement falls within subsections (6) and (7), therefore it is unenforceable.

Hagans states that the contract could be performed in one year from the making thereof, therefore is excepted from the statute. To refute this, Barnett cites Cumberland & Manchester R. Co. v. Posey, 196 Ky. 379, 244 S.W. 770 (1922), and argues that " * * * there is an exclusion to that exception and that is that when the persons or parties contemplate that the contract could not or would not be performed within the year, even though it was possible for performance within that year, then the Statute of Frauds will apply." He notes that we said in Kentucky Utilities Co. v. Hurst, 207 Ky. 448, 269 S.W. 525 (1925):

"But, while such is the general rule, particularly as to contracts which have for their purpose accomplishment of a finished piece of work, and which might be finished within the year, yet some courts including this one, having qualified it as to contracts not for a finished job, and having no fixed time for performance and where from 'the object to be accomplished and the surrounding circumstances it clearly and irresistibly appears that the parties intended that the contract should extend over a year,' in which case the contract will be treated as one not to be performed within that time and as coming with the statute."

Barnett insists that the parties contemplated that the contract would last for more than one year and that the contract is not excepted from the statute, therefore it is unenforceable.

We reject these arguments inasmuch as we held in Appleby v. Buck, Ky., 351 S.W.

2d 494, that "[a]n oil and gas lease is an interest in real estate, * * * within the meaning of the statute of frauds."

Hagans says that "although an oil or gas lease has been held to be an interest in real estate within the Statute of Frauds, a working interest in a gas well is not an interest in real estate." Just as in Appleby, we said in Har-Bel Coal Co. v. Asher Coal Mining Co., Ky., 414 S.W.2d 128 (1966), that " * * * an oil and gas lease is an interest in real estate." And in Williams' Adm'r v. Union Bank & Trust Co., 283 Ky. 644, 143 S.W.2d 297, 131 A.L.R. 1364 (1940), we wrote that "[m]inerals in place are real estate * * *." Cf. 38 Am.Jur.2d 544, Gas & Oil, § 73. The question of whether a royalty interest in oil and gas to be produced was real estate or personalty was fully discussed in Corbett v. La Bere, N.D., 68 N.W.2d 211 (1955). It said:

"The lease * * * was for a period of ten years or as long as the lessee produced oil and gas, or either of them. It conveyed to the lessee an interest which under such leases is generally known as a working interest. It is an interest in real property."

Kash v. United Star Oil Co., 192 Ky. 422, 233 S.W. 898 (1921), held " * * * that an oil or gas lease is an interest in land, and must be in writing, and no valid assignment thereof can be made except in writing." Cf. Beckett-Iseman Oil Co. v. Backer, 165 Ky. 818, 178 S.W. 1084 (1915), and Kentucky Counties Oil Co. v. Cupler, 204 Ky. 799, 265 S.W. 334 (1924). (There is authority to the contrary. See 38 Am. Jur.2d 543, Gas & Oil, § 72.)

In 37 C.J.S. Statute of Frauds, § 112 c, p. 603, it is said:

"While it has been held that a particular oil and gas lease, said to be of a common kind, establishes a mere chattel interest and is not within statutes requiring conveyances or encumbrances of real estate or interests therein to be in writ-

ing; the terms of oil and gas leases are generally such as to bring them within the statute of frauds and to require a written instrument for their creation, extension, transfer, or assignment, as well as for agreements for their execution, or for the transfer or assignment thereof, or an interest therein, or for a surrender of a vested interest thereunder."

"The lessee's interest in the production is sometimes called the 'working interest.'" 38 Am.Jur.2d 539, Gas and Oil, § 66.

In the oil industry, the phrase "working interest" means a portion of the oil and gas that may be produced. Hammer v. Sanders, 6 Ill.App.2d 346, 127 N.E. 2d 492 (1955), and Illinois Nat. Oil & Gas Co. v. Sinclair, 373 Ill. 581, 27 N.E.2d 450 (1940).

The working interest which Hagans claims was an integral part of Barnett's leasehold estate. The property embraced by it—gas below the surface and not reduced to possession—was an interest in real estate. Arrington v. United Royalty Co., 188 Ark. 270, 65 S.W.2d 36, 90 A.L.R. 765 (1933).

Hagans contends that Appleby v. Buck, supra, sustains his position. There it was claimed that the " * * * plaintiffs, at the instance and requests of defendants, had 'located' the leases and arranged with the owner to take them for a consideration of $2,000, following which defendants agreed to furnish it $2,000 and assume the expenses of the first test well on the 21 acres. Plaintiffs were to have a ⅟₁₆ overriding royalty and a ³⁄₁₆ working interest in the 21-acre lease." We held there was a constructive trust which was enforceable. The relationship of the parties in Appleby and other facts reveal a situation materially different from the one now before us. It is of vital concern that here the proof showed Ashland had agreed to convey to Barnett before the alleged promise was made by Barnett. Also that Hagans, as a stockholder and later as president of Alert

Oil and Gas Co., was acting for the benefit of his company.

Appellee also relies on Eubank v. Richardson, Ky., 353 S.W.2d 367 (1962). There one joint adventurer sought to enforce his rights against a co-joint adventurer, and we said that KRS 371.010(6) did not bar such an action. Appellee cites Koplin v. Kelrick, Ky., 360 S.W.2d 203 (1962), but that case sought an accounting by one who had been assigned a working interest in a group of oil and gas leases. It did not involve consideration of the Statute of Frauds.

The claim asserted was predicated upon a " * * * contract for the sale of real estate * * *," therefore because of KRS 371-010(6) the motion for a directed verdict should have been sustained. The judgment is reversed with directions to sustain the motion for judgment n. o. v. and for entry of a judgment dismissing the claim.

All concur.